UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GREG SKISTIMAS et al.,

                Plaintiff,

     v.

HOTWORX FRANCHISING LLC et al.,

               Defendant.

CASE NO. 3:23-cv-05974-DGE

ORDER DENYING MOTION TO DISMISS (DKT. NO. 70) AND GRANTING MOTION TO COMPEL (DKT. NO. 87)

## I      INTRODUCTION

Before the Court is Defendants' Motion to Dismiss (Dkt. No. 70) and Defendants' Motion to Compel Compliance with Contractual Dispute Resolution Procedures (Dkt. No. 87) ("Motion to Compel").  Defendants assert both defenses for lack of personal jurisdiction and for failure to state a claim.  *See* Fed. R. Civ. Pro. 12(b)(2); 12(b)(6); (*See* Dkt. No. 70 at 1–2.)  The Court DENIES Defendant's Motion to Dismiss for lack of personal jurisdiction.  As for the Motion to Compel, the Court GRANTS the alternative relief requested and ORDERS the parties to arbitration.  Finally, the Court STAYS this case pending arbitration.

## II      BACKGROUND

Plaintiffs Greg and Gabriela Skistimas are individuals residing in Kitsap County, Washington.  (Dkt. No. 32 at 2.)  In December 2020, they agreed to open a franchise of HOTWORX, a "hot sauna" fitness studio.  (*See* Dkt. No. 32 at 2–3.)  The Skistimas' studio never opened, though they paid $39,950 for the franchise.  (*Id.* at 2.)  Defendant HOTWORX is a Wyoming limited liability company based in Louisiana.  (*Id.* at 3.)  The LLC's members are citizens of Louisiana and Delaware.  (Dkt. No. 21 at 1.)  Defendant Stephen P. Smith is the CEO of HOTWORX, Defendant Patricia Gattuso is a "Franchise Recruiter" at HOTWORX, and Defendant Nancy Price is likewise employed by HOTWORX in some capacity.  (*See* Dkt. Nos. 32 at 18, 70 at 12.)  All the individual defendants are citizens of Louisiana.  (Dkt. No. 70 at 3.)

Plaintiffs initiated this suit in October 2023 and Defendants initially responded with a Motion to Dismiss certain defendants for lack of personal jurisdiction.  (Dkt. Nos. 1, 22.)  Plaintiffs then filed an amended complaint.  (Dkt. No. 32.)  Defendants filed a Motion to Compel Compliance with Contractual Dispute Resolution Procedures, and Plaintiffs filed a Cross Motion (Dkt. Nos. 44, 48.)  This Court denied Defendants' first Motion to Dismiss as moot and directed Defendants to respond to the amended complaint.  (Dkt. No. 68.)  Further, the Court struck the cross motions regarding dispute resolution procedures as duplicative, and instead directed the parties to consolidate their arguments.  (*See* Dkt. 68.)  The parties having now fully briefed both the Motion to Dismiss and Motion to Compel, the Court proceeds to consider the motions.

## III      JURISDICTION

### A.  Subject Matter Jurisdiction

First, the Court must assess whether it has subject matter jurisdiction under 28 U.S.C. § 1332.  There is diversity of the parties, as Plaintiffs are citizens of Washington and Defendants

1    are citizens of Louisiana, Wyoming, or Delaware.  (*See* Dkt. Nos. 32 at 2–4; 33; 21.)  To

2    establish jurisdiction under 28 U.S.C. § 1332, the amount in controversy must also exceed

3    $75,000.  That is a somewhat closer question (and one not raised by Defendants), but the Court

4    finds Plaintiffs have satisfied their minimal burden to plead damages in excess of $75,000.  *See*

5    *Gaus v. Miller, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) ("Normally, the burden is satisfied if the

6    plaintiff claims a sum greater than the jurisdictional requirement.").  Plaintiffs state that they will

7    seek damages "in an amount to proven at trial, but which Plaintiffs estimate are in excess of

8    $75,000." (Dkt. No. 32 at 31.)  Plaintiffs aver that they paid $39,950 in franchise costs, and they

9    borrowed that money from their retirement account, resulting in "more than $15,000 in fees to

10   [a] consultant and a bank" and "more than $20,000 in taxes and penalties."  (*Id.* at 8.)  Plaintiffs

11   further allege that Defendants improperly debited an amount "which aggregated to

12   approximately $5,000" from their bank account, plus $750 in "convention fees."  (*Id.* at 2.)

13   Because the claimed damages exceed $75,000, and Plaintiffs intend to seek additional damages

14   at trial, the Court finds that the amount in controversy requirement of 28 U.S.C. § 1332 is

15   satisfied.

16                     **B.  Personal Jurisdiction**

17          Next, the Court analyzes personal jurisdiction as to each of the defendants.  As an initial

18   matter, Defendants request that individual Defendants Jessica Matherne, Jodie Mateu, and

19   Melissa Ferguson be dismissed because they no longer appear in Plaintiff's Amended Complaint,

20   and alternatively because the court lacks jurisdiction over them.  (*See* Dkt. Nos. 70 at 6; 32 at 3–

21   4.)  Plaintiff does not respond and does not appear to press any remaining claim against these

22

23

24

individuals.  (*See* Dkt. No. 80.)  The Court thus considers the complaint to be voluntarily dismissed against these defendants and does not analyze its jurisdiction as to them.[1]

For the remaining defendants, the Court proceeds with its analysis of personal jurisdiction.  Personal jurisdiction comes in two types: general and specific. General jurisdiction is broader, and "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("Goodyear").  Defendants are not domiciled in Washington, and so Plaintiffs focus their attention on specific jurisdiction.  (*See* Dkt. No. 80 at 7.)  Specific jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Goodyear*, 564 U.S. at 919.  The Ninth Circuit uses a three-prong test to analyze specific jurisdiction:

> (1) The non-resident defendant must *purposefully direct his activities* or consummate some transaction with the forum or resident thereof; *or* perform some act by which he *purposefully avails himself* of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227–28 (9th Cir. 2011) (emphasis in original).  The plaintiff bears the burden on the first two prongs, and if they carry that burden, the burden shifts to the defendant to make a "compelling case" that applying jurisdiction would be unreasonable.  *Id.*  (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).  In a diversity case such as this, the Court looks to "whether the assertion of jurisdiction satisfies

---

[1] The Court further notes that former-Defendants Matherne, Mateu, and Ferguson were terminated from the docket as of March 12, 2024.

1    [Washington] state law as well as due process requirements." *Sinatra v. Nat'l Enquirer, Inc.*,

2    854 F.2d 1191, 1194 (9th Cir. 1988).

3         The type of claim is also relevant to the jurisdiction analysis.  Here, Plaintiff alleges

4    statutory, contract, and tort claims.  (*See* Dkt. No. 32 at 22–29).  For tort claims, courts use an

5    effects-based test, under which jurisdiction is proper if the defendant "(1) commits an intentional

6    act, (2) expressly aimed at the forum state, that (3) causes harm the defendant knew was likely to

7    be suffered in the forum state."  *Burri L. PA v. Skurla*, 35 F.4th 1207, 1213 (9th Cir. 2022)

8    (citing *Calder v. Jones*, 465 U.S. 783, 788–89).  Under that test, jurisdiction may be proper

9    "even if the defendant never set foot in the forum state, if the defendant's contacts with the forum

10   state are out-of-state acts that had an effect in the forum."  *Id.*

11        Applying that law to the facts of this case, the Court finds that it possesses specific

12   personal jurisdiction as to Defendants Gattuso, Price, and Smith.

13                              i.   Patricia Gattuso

14        As noted above, Patricia Gattuso is a "Franchise Recruiter" for HOTWORX.  In

15   Defendant's own exhibits, she is described as the "Contact owner" for the Skistimas account.

16   (*See* Dkt. No. 45 at 151–55).  She sent an email to Gabriela Skistimas providing the Franchise

17   Disclosure Document ("FDD") that is the subject of this dispute.  (*See id.* at 155.)  The parties

18   disagree as to the extent of her contacts with Plaintiffs, but all agree she played a role in the

19   franchise transaction.  Plaintiffs allege that Gattuso was their primary point of contact with

20   HOTWORX, and that she communicated with them on the phone in late 2020 numerous times

21   until they closed the agreement.  (*See* Dkt. No. 32 at 15.)  She allegedly made representations

22   about the costs of leasehold improvements and what financial performance was "achievable."

23   (*Id.* at 15–17.)  Plaintiffs claim Gattuso also discouraged them from hiring an attorney, saying it

24

would be a "waste of money" because of the "take it or leave it" nature of the franchise contract. (*Id.* at 10.)  Defendants do not contest that Gattuso had phone conversation(s) with Plaintiffs regarding the franchise agreement, but summarily state that "[t]he alleged statements fail to establish sufficient minimum contacts with Washington for the Court to exercise personal jurisdiction" over her.  (Dkt. No. 70 at 10.)  Rather, they claim that "Ms. Gattuso's interactions with Washington are limited to a few occasions of speaking with potential franchisees in Washington over the past four years, none of which required Ms. Gattuso to travel to the State of Washington."  (*Id.*)  Ms. Gattuso has entered a declaration in which she attests that she does not reside in Washington, has never been to Washington for business purposes, and does not own property in Washington.  (Dkt. No. 71-1 at 161–62.)  She also asserts under oath that "I have not consented to jurisdiction in the State of Washington," (*Id.* at 162) which, as discussed below, is clearly false and is directly contradicted by evidence in the record.

It is undisputed that Ms. Gattuso is (or was in the relevant time period) a registered Franchise Broker in the State of Washington.  (Dkt. No. 70 at 11.)  In applying to become a Franchise Broker, Ms. Gattuso signed a registration document that included the following attestation:

> The applicant hereby irrevocably appoints the Securities Administrator as its agent for service of process upon whom may be served any notice, process or pleading in any action or proceeding against it arising out of, or in connection with, the sale of franchises and the undersigned **does hereby consent that any such action or proceeding against it may be commenced in any court of competent jurisdiction and proper venue within the State of Washington** by service of process upon the Securities Administrator with the same effect as if the undersigned was organized or created under the laws of the State of Washington and have been served lawfully with process in this state.[2]

---

[2] Per the terms of the registration form, an "applicant" can be either an individual or a corporate entity.  (Dkt. No. 36 at 8.)  Here, Ms. Gattuso applied for registration in her own name.  (*Id.*)

ORDER DENYING MOTION TO DISMISS (DKT. NO. 70) AND GRANTING MOTION TO COMPEL (DKT. NO. 87) - 6

(Dkt. No. 36 at 10) (emphasis added).

Ms. Gattuso's registration was effective at least as early as March 19, 2020, and she signed renewal applications on November 11, 2020 and January 4, 2021. (*Id.* at 5–11.) Further, Defendant Stephen Smith, acting on behalf of HOTWORX, designated Gattuso as a Franchise Broker authorized to "represent and act on behalf of the Franchisor in the offer or sale of franchises" in the State of Washington. (Dkt. No. 36 at 32.) Defendants argue that Ms. Gattuso (and Ms. Price) signed the Franchise Broker agreement in their corporate capacities and so "the forms only show that HOTWORX consented to Washington's jurisdiction," (Dkt. No. 86 at 6), but that is belied by the registration document itself, which states that it is a registration for an "individual." (Dkt. No. 36 at 8.).

Based on these facts, the Court easily concludes that Ms. Gattuso is subject to personal jurisdiction in this matter. Ms. Gattuso purposefully directed her business activities to the forum state by signing the Franchise Broker registration and proceeding to conduct franchise business in Washington. This claim arises from those forum-related franchise activities. Defendants' contrary statement that "[t]here is no evidence that Ms. Gattuso's attenuated communications were forum-related" is contradicted by their own evidence that she managed the Skistimas account and sent the FDD to Plaintiffs. (*Compare* Dkt. No. 70 at 11 *with* Dkt. No. 45 at 151, 155.) And Defendants cannot be heard to argue that exercising jurisdiction over Ms. Gattuso would "not comport with traditional notions of fair play" and would be "unreasonable" (Dkt. No. 70 at 11) when she *expressly consented* to jurisdiction in the State of Washington for claims arising out of franchise-related transactions by signing the Franchise Broker agreement. Defendants' motion to dismiss Ms. Gattuso from this suit for lack of jurisdiction is denied.

ii. Nancy Price

1    Although Ms. Price's involvement in this matter was less extensive than that of Ms.

2    Gattuso, the Court similarly concludes that Ms. Price is subject to personal jurisdiction.

3    Plaintiffs allege that Ms. Price participated in at least one of the conversations between them and

4    Ms. Gattuso, that in doing so Ms. Price enhanced Ms. Gattuso's credibility, and that they relied

5    on Ms. Price's statements.  (Dkt. No. 32 at 17–18.)  Defendants do not appear to contest that Ms.

6    Price participated in a sales-related conversation with Plaintiffs, though they note that Plaintiffs

7    fail to provide details about her purported statements, and in any event describe the call as an

8    "alleged isolated communication."  (Dkt. No. 70 at 12–13.)  Ms. Price executed a declaration

9    nearly identical to that of Ms. Gattuso disclaiming contacts with Washington, and it includes the

10   same sworn statement that "I have not consented to jurisdiction in the State of Washington"

11   (Dkt. No. 71-1 at 159), which again is clearly false and directly contradicted by evidence.

12   Like Ms. Gattuso, Ms. Price is a registered Franchise Broker in Washington.  Her

13   registration was effective at least as far back as December 31, 2019, and she signed renewals on

14   February 18, 2020 and January 27, 2021.  (Dkt. No. 36 at 12–21.)  As part of those renewals, Ms.

15   Price signed the same attestation that with respect to "any action or proceeding against [the

16   applicant] arising out of, or in connection with, the sale of franchises" she "does herby consent

17   that any such action or proceeding against [the applicant] may be commenced in any court of

18   competent jurisdiction and proper venue within the State of Washington."  (*Id.* at 15)  She too

19   was appointed to represent HOTWORX as a Franchise Broker in Washington.  (*Id.* at 33.)

20   Accordingly, the Court finds that Ms. Price is subject to personal jurisdiction in

21   Washington for this lawsuit.  She purposefully availed herself of the forum by executing the

22   Franchise Broker application and then conducting franchise-sale related activities in Washington.

23   The claim arises out of those contacts.  And it would not be unfair or unreasonable to require her

24

ORDER DENYING MOTION TO DISMISS (DKT. NO. 70) AND GRANTING MOTION TO COMPEL (DKT. NO. 87) - 8

1   to answer to a complaint in Washington when she consented to jurisdiction here for franchise-

2   related litigation.  For those reasons, Defendant's motion to dismiss Ms. Price for lack of

3   jurisdiction is denied.

4                   iii.   <u>Stephen P. Smith</u>

5         Stephen P. Smith is the CEO of HOTWORX.  Plaintiffs allege that Mr. Smith "spoke

6   with Plaintiffs via video conference on or about December 29, 2020" and during that

7   conversation he "reinforced everything that Ms. Gattuso and Ms. Price had said and enhanced

8   their credibility."  (Dkt. No. 32 at 18.)  Plaintiffs provided documentation showing that Mr.

9   Smith, in his capacity as CEO, signed documents registering HOTWORX as a franchise in

10  Washington, and appointing Ms. Gattuso and Ms. Price as franchise brokers.  (Dkt. No. 36 at 22–

11  28, 32–33.)  He executed a "Uniform Franchise Consent to Service of Process" in which he

12  consented for HOTWORX to be sued in Washington and elsewhere, and designated a

13  representative in Louisiana to accept process.  (*Id.* at 31.)  Plaintiffs do not allege that Mr. Smith

14  is a registered Franchise Broker himself.  Like the other individual defendants, Mr. Smith

15  executed an affidavit disclaiming contacts with Washington.  (*See* Dkt. 171 at 155–56.)

16        Plaintiffs argue that jurisdiction can be imputed to Mr. Smith (and the other individual

17  defendants) by operation of the Washington Franchise Investment Protection Act ("FIPA").

18  Wash. Rev. Code 19.100 *et seq.*  FIPA provides that:

19          Any person who is engaged or hereafter engaged directly or indirectly in the sale

20          or offer to sell a franchise or a subfranchise or in business dealings concerning a
            franchise, either in person or in any other form of communication, shall be subject

21          to the provisions of this chapter, shall be amenable to the jurisdiction of the courts
            of this state and shall be amenable to the service of process under RCW 4.28.180,

22          4.28.185, and 19.86.160.

23  Wash. Rev. Code Ann. § 19.100.160 (West).

24

ORDER DENYING MOTION TO DISMISS (DKT. NO. 70) AND GRANTING MOTION TO COMPEL (DKT.
NO. 87) - 9

The act defines "person" to include:

> [A] natural person, corporation, partnership, trust, or other entity and in the case of an entity, it shall include any other entity which has a majority interest in such an entity or effectively controls such other entity as well as the individual officers, directors, and other persons in act of control of the activities of each such entity.

Wash. Rev. Code Ann. § 19.100.010 (West).

Plaintiffs argue "FIPA pierces any corporate veil as to any 'persons,'" citing these provisions. (Dkt. No. 80 at 5.)

Plaintiffs seem to present FIPA as an alternative to traditional jurisdiction principles, but the analysis runs the other direction: if Mr. Smith comes within the ambit of FIPA, the Court proceeds to assess whether exercise of jurisdiction would comport with due process. *See Garrett Tr. for estate of Taylor v. Rothschild*, No. C18-5863 BHS, 2019 WL 1957929, at *4 (W.D. Wash. May 2, 2019) (conducting due process analysis *after* determining that defendant fell within FIPA). The statutory interpretation question is easy; Mr. Smith, as CEO, is an officer of HOTWORX, a franchisor, so he falls within the FIPA. The due process question is harder.

As an initial matter, the Court rejects Plaintiffs' premise that filing HOTWORX's corporate registration forms can be imputed to Mr. Smith personally for purposes of a minimum contacts analysis. Rather, the Ninth Circuit has specifically rejected the idea that a CEO's signature on behalf of a company establishes personal jurisdiction, instead stating that each "party's 'contacts with the forum [s]tate must be assessed individually.'" *In re Boon Glob. Ltd.*, 923 F.3d 643, 650–51 (9th Cir. 2019) (quoting *Calder*, 465 U.S. at 790). The Washington Court of Appeals has also instructed that a jurisdiction analysis for corporate officers under FIPA must be based on "individual activities." *Huebner v. Sales Promotion, Inc.*, 684 P.2d 752, 757 (Wash. App. 1984).

1    Therefore, the Court focuses its attention on the one action that Plaintiffs attribute to Mr.

2    Smith personally: a videocall in which Mr. Smith helped sell the franchise to Plaintiffs and

3    "reinforced" the allegedly fraudulent statements made by HOTWORX employees.  Defendants

4    argue that "one lone, vague conversation" is insufficient to establish personal jurisdiction.  (Dkt.

5    No. 70 at 13.)  In the Court's view, the videocall is not so easily dismissed.  Rather, the Ninth

6    Circuit has cautioned that "[i]t is the quality of these contacts, however, and not the quantity, that

7    confers personal jurisdiction over a defendant."  *Brainerd v. Governors of the Univ. of Alberta*,

8    873 F.2d 1257, 1259 (9th Cir. 1989).

9    *Brainerd* is instructive.  In that case, Plaintiff Brainerd sued Defendant Meekison, a Vice

10   President at the University of Alberta, alleging that during a phone call Meekison received from

11   a counterpart at the University of Arizona, Meekison disparaged Brainerd—violating a

12   separation agreement Brainerd had with the University of Alberta and negatively impacting his

13   offer of employment in Arizona.  *See id.* at 1258.  The Ninth Circuit held that the phone call, the

14   contents of which were disputed, was sufficient to establish jurisdiction over Meekison in

15   Arizona.  *Id.* at 1259–60.  Even though Meekison did not initiate the call, accepting the

16   allegations in the complaint as true, Meekison directed his tortious communications into Arizona

17   and knew that their harm would occur there.  *Id.* at 1259.  That was enough for jurisdiction to

18   attach, and for the exercise of jurisdiction to be reasonable.  *See id.* at 1259–60 ("where acts are

19   performed for the very purpose of having their consequences felt in the forum state, the forum

20   will have personal jurisdiction over the actor");*see also Burri Law*, 35 F.4th 1207 (applying

21   *Brainerd* and finding jurisdiction proper in Arizona based on communications from out of state).

22   Washington courts' evaluation of the reach of personal jurisdiction under FIPA also

23   controls.  *See Sinatra*, 854 F.2d at 1194.  In *Huebner*, 684 P.2d 752, the Washington Court of

24

1   Appeals held that extending jurisdiction to the President and Vice President of a franchisor under

2   FIPA did not violate due process.  The court found that one of the individual defendants "was

3   responsible for the advertisements in Washington" that led the Plaintiff to sign the franchise

4   agreement, and the other merely "contacted" the Plaintiff "and other Washington residents"

5   regarding franchises.  *Id.* at 756.  The court was unmoved by the President's statement that he

6   had never been to Washington and effort to "liken[] himself to an office secretary who merely

7   corresponds occasionally with out of state residents by telephone and mail," instead focusing on

8   his conduct directed at the forum.  *Id.* (citing *Calder*).  The basis for jurisdiction in this case is

9   nearly the same.

10          For those reasons, the motion to dismiss Defendant Smith for lack of personal jurisdiction

11   is denied.

12                      **IV      MOTION TO COMPEL**

13          Because the Court is satisfied that it has jurisdiction over the individual defendants, and

14   jurisdiction as to the corporate defendant is unchallenged, the Court proceeds to consider

15   Defendants' Motion to Compel.  (Dkt. No. 87).  Defendants' motion is styled as a "Motion to

16   Compel Compliance with Contractual Dispute Resolution Procedures."  (*Id.*)  Defendants ask

17   this Court to dismiss this case under Federal Rule of Civil Procedure 12(b)(6) for failure to

18   comply with these contractual dispute resolution processes and to compel compliance, or in the

19   alternative, to stay the case and compel compliance, "up to and including" arbitration.  (*Id.* at

20   23.)  The Court construes this as an alternative request to compel arbitration.  (*See id.* at 13,

21   asking the Court to "enforce the arbitration agreements under §§ 3 and 4 of the FAA, leaving

22   Plaintiffs' challenges to be determined by the arbitrator.").  Plaintiffs treat this entire dispute

23   process as a singular Arbitration Clause and argue that the one-sidedness and open-ended

24

1   timelines of the dispute resolution process is a reason this Court should hold the Arbitration

2   Clause unconscionable.  (*See* Dkt. No. 89 at 11–14.)  The Court holds that under the terms of the

3   contract, "any dispute" is subject to arbitration, including a dispute about the pre-arbitration

4   process.  The Court thus grants Defendants their alternative requested relief and compels the

5   parties to arbitration.

6           **A.        Dispute Resolution Process**

7           Defendants seek to have this Court order enforcement of the FDD's dispute resolution

8   clauses, which provide a three-step process: first, claimants must submit to an internal dispute

9   resolution process, in which they (and their attorney) would meet with a corporate representative

10  via videocall.  (Dkt. No. 87 at 5.)  Next, and at the Franchisor's discretion, claims are submitted

11  to mediation.  (*Id.* at 5–6.)  Finally, if those processes fail, and again at the Franchisor's option,

12  claims proceed to arbitration.  (*Id.* at 6–7.)  In relevant part, the three-step dispute resolution

13  process is as follows:

14          25.2 <u>Internal Dispute Resolution</u>. Before commencing any legal action against
            Franchisor or its Affiliates with respect to any such claim or dispute, you must
15          submit a notice of dispute which specifies, in detail, the precise nature and
            grounds of such claim or dispute to Franchisor. If your claim or dispute cannot be
16          resolved, you must agree to a face-to-face meeting between you, your attorney if
            you have retained one, a corporate representative from Franchisor and the
17          Franchisor's counsel prior to engaging in mediation. This meeting may occur via
            Skype or another virtual face-to-face platform. You must exhaust these internal
18          dispute resolution procedures before proceeding to mediation.

19          25.3 <u>Mediation</u>. In the event any claim or dispute is not resolved under Section
            25.2 and at Franchisor's option, all claims or disputes between you and Franchisor
20          or its Affiliates arising out of, or in any way relating to, this Agreement, or any of
            the parties' respective rights and obligations arising out of this Agreement, shall
21          be submitted first to mediation, in Jefferson Parish, Louisiana. The parties shall
            equally share the costs of mediator's fees. Franchisor may elect to establish a Peer
22          Compliance Committee (PCC) to review certain claims Franchisor or you may
            make against each other

23

24

1

2

3

4

5

    25.4 <u>Arbitration</u>. At Franchisor's option, all disputes and claims relating to this Agreement or any ancillary agreement entered into between the parties, the rights and obligations of the parties, or any other claims or causes of action relating to the making, interpretation, or performance of either party under this Agreement, shall be settled by arbitration in Jefferson Parish, Louisiana in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association. [Sections regarding limitations period and attorneys' fees omitted, see *infra*.]

(Dkt. No. 88 at 28–29).[3]

6

7

8

       Defendants argue that in enforcing this dispute resolution process, this Court should follow the example of *Two Guys, Inc v. Nick-N-Willy's Franchise Co.*, LLC, No. C11-5537BHS, 2011 WL 4596692 (W.D. Wash. Oct. 3, 2011); (*See* Dkt. No. 87 at 11).  In that case, the court

9

10

11

granted a Rule 12(b)(6) motion and compelled mediation against franchisees, because the franchisees did not plead that they participated in contractually required mediation.  *Id.*  Plaintiff argues this case is inapposite because it did not involve a challenge to the validity of an

12

13

14

arbitration clause.  (Dkt. No. 89 at 23–24.)  In their reply (Dkt. No. 91 at 3), Defendants also cite *LoanCraft, LLC v. First Choice Loan Services, Inc.*, No. 12-10138, 2012 WL 628617 at *1 (E.D. Mich. Feb. 27, 2012), in which the court granted a motion to dismiss for failure to follow a

15

16

17

dispute process.  That process started with internal "informal means," and, if thirty days had elapsed without resolution, "a mutually agreed non-binding alternative dispute resolution technique."  *Id.*.  If those steps failed, either party could seek judicial resolution.  *Id.*

18

19

20

       These cases are distinguishable because they do not involve a dispute resolution process being used as a gateway to arbitration.  Further, *LoanCraft* involved a time-limited dispute

21

22

23

24

[3] The parties also signed an Area Development Agreement ("ADD") which contains a parallel dispute resolution process clause.  (*See* Dkt. 88 at 61.)  The dispute resolution process terms in the ADD are nearly the same, though it omits reference to a "Peer Compliance Committee" under the mediation section, and it makes more explicit that arbitration is to take place only after the preceding steps have failed, "and at HOTWORX®'s sole discretion."  (*Id.*)

ORDER DENYING MOTION TO DISMISS (DKT. NO. 70) AND GRANTING MOTION TO COMPEL (DKT. NO. 87) - 14

1  resolution process, after which the contract provided for mutually agreed dispute resolution, or

2  judicial review.  *Id.*  Defendants' cases thus do not address Plaintiffs' argument that the dispute

3  resolution process is unenforceable because it is indeterminate in length and leaves access to

4  arbitration at Defendants' sole discretion, citing *Steven Burnett v. Pagliacci Pizza, Inc*, 442 P.3d

5  1267 (Wash. Ct. App. 2019).  (*See* Dkt. No. 89 at 14).  In that case, the Washington Court of

6  Appeals invalidated an internal dispute process (referred to as "F.A.I.R.") that prohibited

7  arbitration unless the process was completed.  442 P.3d at 1269–70.  Because the F.A.I.R. policy

8  "makes no commitment to address disputes or schedule nonbinding conciliation within a

9  specified period," putting the time for compliance beyond "the employee's control" and included

10  no "release valve" allowing arbitration if an unreasonable amount of time had elapsed (or if the

11  limitations period would expire), it provided the defendant with "unfair advantages" and was

12  unconscionable.  *Id.* at 1279.

13         Ultimately, the Court does not rule on enforceability of the dispute resolution process,

14  because the text of the contract delegates "all disputes and claims relating to this Agreement or

15  any ancillary agreement entered into between the parties" to the arbitrator.  (Dkt. No. 88 at 29.)

16  The parties dispute whether internal dispute resolution and/or mediation is required under the

17  contract or appropriate under the circumstances, and that dispute itself is a "dispute[] and claim[]

18  relating to [the Parties'] Agreement"  to be decided by an arbitrator.  Further, as discussed below,

19  the Court agrees with Defendants that under Ninth Circuit caselaw, incorporation of the

20  American Arbitration Association ("AAA") rules delegates arbitrability disputes to the arbitrator.

21  Accordingly, the Court proceeds to consider Defendants' alternative request for relief,

22  compelling arbitration.

23         **B.**    **Arbitration Clause**

24

Defendants seek an order compelling Plaintiffs to arbitration, and Plaintiffs oppose on the grounds that the Arbitration Clause is unconscionable.  (*See* Dkt. Nos. 87 at 23; 89.)  Courts analyze unconscionability challenges to arbitration clauses in different manners depending on whether the challenge is to the entire contract, or solely to the arbitration clause.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010).  Similarly, a challenge can be to procedural or substantive unfairness of the arbitration clause, or both.  *Id.* at 73–74.  Here, Plaintiffs clarify that they are challenging only the Arbitration Clause itself, not the entire contract.  (Dkt. No. 89 at 8.)  And while they recite the legal standard for a procedural challenge (*see id.* at 9), their challenge focuses on the alleged substantive unconscionability of the Arbitration Clause.  (*Id.* at 8–20.)  Plaintiffs articulate five principal reasons that the Arbitration Clause is unconscionable:[4]

1) It provides that Louisiana law is the governing law for the contract and the venue for disputes in violation of FIPA (*see* Dkt. No. 89 at 9–11);

2) The internal dispute resolution process and mediation provision are one-sided (*id.* at 11–14);

3) It shortens the limitations period for claims, in violation of FIPA (*id.* at 14–18);

4) It deprives Plaintiffs of the right to punitive or exemplary damages, in violation of FIPA, and (*id.* at 18–19);

5) It requires Plaintiff to pay attorneys fees if Defendant prevails but not the reverse, in violation of FIPA (*id. at* 19–20).

---

[4] Plaintiffs have named other aspects of the FDD they argue are unconscionable: that the contract applies arbitration to claims against the Franchisor's officers, but not to claims against Franchisees, that only the Franchisor can seek injunctive relief, that only the Franchisor does not waive strict compliance by course of performance, and that only Franchisees are subject to personal liability.  (*See* Dkt. No. 32 at 8–9.)  But since Plaintiffs focus their argument on these five principal deficiencies, the Court does so as well.

The corresponding clauses of the contract (other than the internal dispute resolution and

mediation clauses, already discussed *supra*), provide as follows:

25.1 <u>Governing Law</u>. This Agreement shall be deemed to have been made in the State of Louisiana and shall be construed according to the laws of Louisiana without regard to its conflict of laws, La. Civ. Code Arts. 3515 et seq., and any amendments and/or revisions thereto.

. . .

25.4 <u>Arbitration</u> At Franchisor's option, all disputes and claims relating to this Agreement or any ancillary agreement entered into between the parties, the rights and obligations of the parties, or any other claims or causes of action relating to the making, interpretation, or performance of either party under this Agreement, shall be settled by arbitration in Jefferson Parish, Louisiana in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association. Any arbitration proceeding, or any claim in arbitration (including any defense and any claim of setoff or recoupment), must be brought or asserted before the expiration of the earlier of (1) the time period for bringing an action under any applicable state or federal statute of limitation; (2) 1 year after the date upon which a party discovered or should have discovered, the facts giving rise to an alleged claim; or (3) 2 years after the first act or omission giving rise to an alleged claim. Claims of Franchisor attributable to the underreporting of sales and claims of the parties for indemnification shall be subject only to the applicable state or federal statute of limitation.[5]

. . .

25.9 <u>Waiver of Punitive Damages</u>. You waive to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) which you the parties may have against Franchisor, its Affiliates, successors or assigns, arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, recovery shall be limited to actual damages. If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, this provision shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

---

[5] Clause 25.5 of the FDD provides: "<u>Third-Party Beneficiaries</u>. Franchisor's officers, directors, shareholders, agents, employees and/or Affiliates are express third-party beneficiaries of this Agreement and the mediation and arbitration provisions contained herein, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by you." (Dkt. No. 88 at 29.) Thus, the claims against the individual defendants are also presumptively subject to arbitration.

. . .

> 25.11 <u>Attorneys' Fees</u>. If either party institutes any judicial or arbitration proceeding to enforce any obligations under or to interpret the terms of this Agreement and Franchisor prevails in the action or proceeding, you shall be liable to Franchisor for all costs, including reasonable Attorneys' fees, incurred in connection with such proceeding.[6]

(Dkt. No. 88 at 28–30.)

Before the court can consider unconscionability at all, however, there is a threshold question of who makes the determination of arbitrability: the Court or the arbitrator.  Defendants argue that the FDD delegates any questions of arbitrability to the arbitrator by incorporating the rules of the American Arbitration Association ("AAA").  (Dkt. No. 87 at 14–17.)  Plaintiffs disagree.  (Dkt. No. 89 at 24.)  There is also a question as to whether several provisions of the Arbitration Clause that Plaintiffs challenge as unconscionable are in effect in this contract at all; Defendants argue that these provisions are superseded by the "Washington Addendum" to the FDD.  (Dkt. Nos. 87 at 20–22; 91 at 7–12.)  Plaintiffs dispute that the Washington Addendum was properly incorporated into the contract.  (Dkt. Nos. 89 at 23; 32 at 10–11.)

As explained below, the Court agrees with Defendants that binding Ninth Circuit caselaw holds that incorporation of the AAA rules is sufficient to delegate arbitrability to the arbitrator. In the alternative, the Court finds that the Washington Addendum was incorporated into the contract between the parties, and it obviates or narrows the claimed bases of unconscionability. Thus, the Court grants Defendants' alternative motion to compel arbitration.

        i.   <u>Delegation Clause</u>

---

[6] Subpart 25.4.2 of the Arbitration section also provides "[i]f Franchisor is the prevailing party, the arbitrator's award shall include all fees, costs and attorneys' fees, notwithstanding the foregoing."  (Dkt. No. 88 at 29.)

1    Typically, when a party challenges an arbitration clause in a contract, "the federal court

2    must consider the challenge before ordering compliance with the agreement under § 4" of the

3    Federal Arbitration Act ("FAA").  *Rent-A-Center,* 561 U.S. at 71.  But when the parties instead

4    agree by contract that the arbitrator will rule on gateway questions of arbitrability, courts are

5    bound to give effect to that "delegation" clause, unless a party challenges the delegation

6    specifically.  *Id.* at 71–4.  Here, Defendants argue that the contract contains a delegation clause,

7    and that Plaintiffs fail to challenge it specifically.  (*See* Dkt. No. 87 at 14–17.)  The Court agrees.

8    The language of the FDD on its face does not reference delegation.  Despite the lack of

9    an explicit delegation clause, Defendants argue that under Ninth Circuit caselaw, incorporating

10   the Commercial Arbitration Rules of the American Arbitration Association is sufficient to

11   delegate arbitrability to the arbitrator.  (Dkt. No. 87 at 14–15.)  In *Brennan v. Opus Bank*, 796

12   F.3d 1125, 1130 (9th Cir. 2015), the Ninth Circuit unambiguously held "that incorporation of the

13   AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to

14   arbitrate arbitrability."  The key language in the AAA rules is that the "arbitrator shall have the

15   power to rule on his or her own jurisdiction, including any objections with respect to

16   the . . . validity of the arbitration agreement."  *Id.*  The court went onto note that it was dealing

17   with a commercial dispute involving sophisticated parties, but that the same rule may apply in

18   other contexts.  *Id.* at 1130–31.  More recently, in *Caremark, LLC v. Chickasaw Nation*, 43 F.4th

19   1021, 1031 (9th Cir. 2022), the court reaffirmed this rule.  The court held that a pharmacy

20   services contract (the "Provider Agreement") between Caremark and the Chickasaw Nation

21   included a delegation clause because the AAA rules were incorporated in a Provider Manual,

22   which in turn was incorporated in the Provider Agreement.  *Id.*  Prior to 2014 the Provider

23

24

1   Manual merely incorporated the AAA rules, and post-2014 it included an explicit delegation

2   clause, but the court noted that under *Brennan*, incorporation of the rules was sufficient.  *See id.*

3          Plaintiffs have no response to this line of cases.  They argue that the Arbitration Clause

4   contains no explicit delegation clause, ignoring the issue of AAA rules entirely.  (*See* Dkt. No.

5   89 at 24.)  To the extent it exists, Plaintiffs do not challenge the validity of a delegation clause

6   specifically; they argue it is unconscionable for the same reasons the remainder of the arbitration

7   clause is unconscionable—that they cannot access arbitration other than at the sole discretion of

8   Defendants.  (*See id.*)

9          The Court notes that Defendants have not provided the exact delegation language

10  contained in the AAA Commercial Arbitration Rules in effect at the time of contract formation.

11  Nonetheless, the Court cannot ignore the unmistakable directive of the Ninth Circuit that

12  incorporation of the AAA rules is sufficient for delegation, especially without responsive

13  argument by Plaintiffs.  Accordingly, the Court holds that the contract does delegate arbitrability

14  to the arbitrator.

15                  ii.   <u>Washington Addendum</u>

16         In the alternative, even if delegation did not apply, the text of the Washington Addendum

17  takes some of the alleged bases of unconscionability out of play entirely, while others are

18  diminished or arguably resolved.

19         First, the Court considers if the Washington Addendum was properly incorporated into

20  the contract.  Plaintiff argues Defendant has only "belatedly" embraced the Washington

21  Addendum and claims it was "omitted" from the contract.  (*See* Dkt. No. 89 at 23.)  Plaintiffs

22  claim they were not aware of this addendum until 2022 or 2023.  (*See* Dkt. No. 32 at 10–11.)

23  This argument is without merit.  Plaintiffs signed and initialed "Exhibit K" "Item 23" of the

24

FDD, entitled "Receipt" in which they acknowledge receiving a list of exhibits to the FDD, including "Exhibit J – State Specific Addenda." (Dkt. No. 88 at 56–57.) [7] Plaintiffs signed the FDD on December 29, 2020. (*See* Dkt. No. 88 at 68.) The Receipt indicates that Plaintiffs were on notice of the state addenda and incorporates them into the FDD. *See Satomi Owners Ass'n v. Satomi, LLC*, 225 P.3d 213, 225 (Wash. 2009) ("If the parties to a contract clearly and unequivocally incorporate by reference into their contract some other document, that document becomes part of their contract."). Further, Washington Administrative Code 460-80-305 requires that a FIPA addendum be included in a "franchise agreement *or* Franchise Disclosure Document" (emphasis added)—here the addendum was not attached to the franchise agreement but was included in the FDD. (*See* Dkt. No. 70 at 21.) Thus, the Washington Addendum applies to this dispute. The text of the Addendum provides, in relevant part:

> This Amendment shall pertain to franchises sold in the State of Washington and shall be for the purpose of complying with the Washington Franchise Investment Protection Act ("WFIPA"), codified at Wash Rev. Code 19.100.010 et seq., and accompanying regulations.
>
> 1. In the event of a conflict of laws, the WFIPA provisions will govern.
>
> 2. RCW 19.100.180 may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

---

[7] The Washington Addendum itself contains a signature line that is unsigned. (*See* Dkt. No. 88 at 306.) That does not make incorporation via the Receipt ineffective. *See W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 7 P.3d 861, 494 (Wash. Ct. App. 2000) ("Incorporation by reference allows the parties to 'incorporate contractual terms by reference to a separate ... agreement to which they are not parties, and including a separate document which is unsigned.'"); *Stuebe v. S.S. Indus., LLC*, No. C17-5814 BHS, 2018 WL 3496614, at *2 (W.D. Wash. July 20, 2018) ("It is well settled that terms of another unread, unsigned agreement can be incorporated by reference so long as the unsigned document is identified and readily available for inspection.").

3. In any arbitration or mediation involving a franchise purchased in the State of Washington, the arbitration or mediation site will be either in the State of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of WFIPA, in Washington.

4. A release or waiver of rights executed by the Franchisee may not include rights under the WFIPA or any rule or order thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit statutes of limitations period for claims under the Act, or rights or remedies under the Act such as the right to a jury trial, may not be enforceable.[8]

(Dkt. No. 88 at 305–06.)

As to Plaintiffs' claim that the contract is unconscionable because Louisiana law governs, that concern is obviated by Paragraph 1, which states that if there is a conflict between FIPA and other law, FIPA governs.  FIPA itself prohibits waiving compliance with its requirements via a choice of law provision or other agreement.  Wash. Rev. Code § 19.100.220.  Further, Paragraph 3 removes any concern that Plaintiffs would be forced to travel to Louisiana to mediate or arbitrate their claims.  As to Plaintiffs' objection to the limitations period provision of the FDD, Paragraph 4 provides that "[p]rovisions such as those which unreasonably restrict or limit statutes of limitations period for claims under the Act, or rights or remedies under the Act such as the right to a jury trial, may not be enforceable."  Plaintiffs worry that use of the word "may" makes this clause non-binding for Defendants (*see* Dkt. No. 89 at 23), but Defendants accept that the Washington Addendum supersedes the FDD's period of limitations.  (*See* Dkt. No. 91 at 9–

---

[8] Plaintiffs offer no argument that the provision in Paragraph 4 of the Addendum referencing the "right to a jury trial" requires a jury trial here, and do not cite any provision of FIPA guaranteeing such a right.  Further, Paragraph 3 contemplates arbitration in Washington, unless "litigation is not precluded by the franchise agreement"—and Plaintiffs do not argue that franchise agreement itself allows litigation.  Nonetheless, Plaintiffs are free to argue to an arbitrator that there is a statutory or contractual right to a jury trial.

10; *see also* Dkt. No. 87 at 20–21, citing Wash. Rev. Code §§ 4.16.080(4), 4.16.130.)  Thus, there is no live dispute about enforcing a shorter limitations period.  Likewise, Paragraph 4's reservation of "rights and remedies" guaranteed by the Act preserves Plaintiffs' access to damages they may seek to recover by statute, including attorney's fees and costs, under Washington Revised Code § 19.100.190.

The Court does not undertake a full analysis of the enforceability of each element of the contract under FIPA, because ultimately it will be up to the arbitrator to determine how to reconcile the contract and FIPA to the facts of this case.  Where four of the five principal bases for asserting unconscionability are eliminated because of the Washington Addendum, the Court cannot grant Plaintiffs' request to invalidate the arbitration clause in its entirety.  As to the remaining principal basis for finding unconscionability, it relates to the applicability and enforceability of the internal dispute resolution process and the mediation provision—a dispute subject to arbitration.

### C.    Stay or Dismissal

Defendant asks that this Court dismiss this action after compelling arbitration, or in the alternative, stay the case.  (*See* Dkt. 87 at 2.)  Until recently, courts in the Ninth Circuit used their discretion to decide whether to stay or dismiss a case pending arbitration, applying *Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988).  However, the Supreme Court overruled *Sparling* in *Smith v. Spizzirri*, 601 U.S. 472, 475–77 (2024), holding that if a party requests a stay pending arbitration under 9 U.S.C. § 3, a stay rather than dismissal is mandatory under the text of the statute.  The Court also articulated prudential reasons for stay over dismissal: the FAA does not intend for orders compelling arbitration to be immediately appealable, unlike a dismissal, but does intend for courts to play a supervisory role as the arbitration is pending.  *Id.*

at 478.  Accordingly, the Court will grant Defendants' alternative request, and stay this case pending arbitration.

## V    CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss (Dkt. No. 70) is DENIED as to lack of jurisdiction, and the Court does not reach the merits of Defendants' other defenses for failure to state a claim.  Defendants' Motion to Compel (Dkt. No. 87) is GRANTED, to the extent it seeks an order compelling arbitration.  Pursuant to 9 U.S.C. §§ 3–4, the Court ORDERS the parties to proceed to arbitration and STAYS this case.

Dated this 22nd day of October, 2024.

David G. Estudillo
United States District Judge